UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| WAYNE D. HALE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10-CV-0532-CVE-FHM |
| | ) | |
| SPEARS WRECKER SERVICE, LLC, | ) | |
| an Oklahoma corporation, and | ) | |
| DALE SPEARS, an individual, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

Now before the Court is Defendants' Motion for Summary Judgment and Brief in Support (Dkt. # 17). Plaintiff filed a response in opposition (Dkt. # 19); defendants filed a reply (Dkt. # 24) and an amended reply (Dkt. # 25).

**I.**

Plaintiff Wayne D. Hale was hired by defendant Spears Wrecker Service, LLC (Spears) as a "wrecker driver" in April 2009. Dkt. # 2, at 2. Defendant Dale Spears is an officer of Spears and, plaintiff claims, "the responsible party for the corporate defendant and the acts complained [of] herein." Id. at 1-2. Spears is licensed to operate only in Oklahoma, and "is engaged in the business of providing wrecker services in Osage and Tulsa Counties only." Dkt. # 17, at 2. Wrecker drivers for Spears perform two services: "courtesy runs," which involve towing vehicles from scenes where no one has been arrested; and "impoundment runs," in which a vehicle is towed following an arrest. Id. at 3. Drivers are not required to make out-of-state phone calls or otherwise communicate with people in other states. Id. Although drivers are required to answer calls for service, such calls generally come from local law enforcement agencies. Id.

From April 2009 to May 22, 2010, plaintiff was employed by Spears, where his "only job" was to operate a wrecker truck. Dkt. ## 2, at 2; 17, at 2. Plaintiff claims that his responsibilities at Spears included removing "wrecked and broken down vehicles from Interstates 44 and 244, U.S. Routes 64 and 412, the Creek Turnpike,[1] Muskogee Turnpike,[2] the Broken Arrow Expressway,[3] Oklahoma State Highways 97 and 412, and "the city and county streets of Sand Springs, Oklahoma and Tulsa, Oklahoma." Dkt. # 19, at 6. Plaintiff's job responsibilities did not require him to travel outside Oklahoma. Dkt. # 17, at 2. During the time of his employment with Spears, plaintiff made a total of 356 runs, including 301 "impoundment runs" and 55 "courtesy runs." Dkt. # 17, at 3.

Plaintiff states that "courtesy runs" required him to travel to the scene of the accident, remove the wrecked vehicle from the scene, and clean up any debris on the roadway. Id. at 7. Plaintiff would then "transport the vehicle either to the place selected by the owner . . . or the [Spears] impound lot located in Sand Springs, [Oklahoma]." Id. Plaintiff describes "impoundment runs" as providing assistance to law enforcement agencies in removing impounded vehicles from the roadways, including "vehicles seized from D.U.I. drivers that were pulled over by the police, vehicles seized at safety checkpoints, [vehicles at the scene of] accidents, stolen vehicles which had been recovered, and disabled law enforcement vehicles." Id. at 8. Defendants claim that

---

[1] The Creek Turnpike is a 33.2 mile, wholly intrastate highway. See [Office of Transportation Authority (OTA)] History FAQs, https://www.pikepass.com/about/FAQs.aspx (last visited May 19, 2011).

[2] The Muskogee Turnpike is a 53.1 mile, wholly instrastate highway that connects Interstate 40 to Tulsa, Oklahoma. See OTA History FAQs, https://www.pikepass.com/about/FAQs.aspx (last visited May 19, 2011).

[3] Oklahoma State Highway 51.

"impoundment runs do not involve removing vehicles from roadways," but they do not address the duties involved in "courtesy runs." Dkt. # 17, at 3.

In September 2009, an automobile that plaintiff was transporting was damaged while under his sole control. Dkt. # 17, at 3-4. He claims that although he secured the vehicle properly, the chain connecting the vehicle to his truck became loose, causing the vehicle to slide. Dkt. # 19, at 8. Spears paid $835.68 to repair the damage to the automobile. Dkt. # 17, at 4. Beginning October 7, 2009, Spears deducted $25.00 from plaintiff's wages each week to recoup its repair costs. Id. Plaintiff was aware of the deductions. Id. Plaintiff claims that, although he knew about the deductions, they were made pursuant to a unilateral decision by Dale Spears, and no agreement regarding the deductions was memorialized in writing. Dkt. # 19, at 9. Plaintiff's employment with Spears was terminated May 22, 2010, based on plaintiff's failure to appear for work. Dkt. # 17, at 4. The full amount of the repair costs was recouped by Spears prior to plaintiff's termination. Id.

Plaintiff claims that he regularly performed work in excess of forty hours per week while employed by defendants, and that he was not properly compensated for the time he worked. Dkt. # 2, at 2. He also claims that the withholding of money from his paycheck was improper under Oklahoma law.[4] Dkt. # 2, at 3.

---

[4] Plaintiff's complaint includes an allegation that defendants failed to provide him pay within a reasonable time of termination of his employment, in violation of Oklahoma law. However, the complaint did not contain a separate count on that ground, and the Court does not find that plaintiff's complaint states a claim for relief based on failure to provide pay following termination.

**II.**

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court draws "all justifiable inferences," id. at 254, and construes the record in the light most

4

favorable, Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998), to the party opposing summary judgment.

**III.**

Plaintiff brings a claim under the Fair Labor Standards Act (FLSA) based on defendants' failure to pay him the overtime wages he was due. Defendants move for summary judgment on the ground that the overtime provisions of the FLSA did not apply to plaintiff.

Under the FLSA,

> [N]o employer shall employ any of his employees who . . . is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1). By its terms, the FLSA overtime provision applies only to those employees who are engaged in commerce, produce goods for commerce, or are employed by an enterprise engaged in commerce or the production of goods. Plaintiff claims that during his employment with Spears, he was an individual engaged in commerce under the FLSA. Dkt. # 19, at 11. He does not claim that he produced goods for commerce, or that he was employed by a qualifying enterprise. Id.

It is "established beyond controversy that to be engaged in commerce within the meaning of that phrase [in the FLSA], an employee must be actually engaged in the movement of commerce, or the services he performs must be so closely related thereto as to be for all practical purposes an essential part thereof." New Mexico Public Servs. Co. v. Engel, 145 F.2d 636, 638 (10th Cir. 1944). "And in that connection closeness depends upon the essentiality and indispensability of the particular work or services performed to the actual movement of commerce." Id. "If a cessation of

the services of the employee causes an interruption or interference with the free movement of commerce, it is ordinarily regarded as an essential and indispensable part thereof." Id. "[A]lthough Congress did not intend to exert its full powers over interstate commerce [in the FLSA], it did intend 'to extend federal control in this field throughout the farthest reaches of the channels of interstate commerce,' and in determining whether an employee was engaged in commerce within the meaning of the definition, courts should be guided by practical considerations." Id. at 638-39 (quoting Walling v. Jacksonville Paper Co., 317 U.S. 564 (1943)). "The question of essentiality and indispensability involves the process of exclusion and inclusion – a problem of drawing lines, and where the line should be drawn depends upon the application of these facts to the prescribed legal standards." Id. at 639.

As noted, plaintiff alleges that, while an employee of Spears, he cleaned up accident scenes at and towed vehicles from Interstates 44 and 244, U.S. Routes 64 and 412, the Creek Turnpike, Muskogee Turnpike, the Broken Arrow Expressway, Oklahoma State Highways 97 and 412, and "the city and county streets of Sand Springs, Oklahoma and Tulsa, Oklahoma." Dkt. # 19, at 14. He claims that the "net effect of these activities promotes the free flow of commerce from outside . . . Oklahoma, into and through the State, and to destinations outside the State," and that his activities for defendants were "undertaken on a key instrumentality of the interstate commerce system, the interstate highway system" Id. Plaintiff claims that in providing tow services on the aforementioned "aspects of the Interstate Highway system," he "towed vehicles from Oklahoma as well as foreign states including Texas, Kansas, Missouri, Michigan, Arkansas[,] and Colorado." Dkt. # 19-1, at 2. He further attests that "[a] major part of towing vehicles . . . is to assist in clearing the accident site so as to reduce traffic backup, including semi trucks transporting goods and items

6

in commerce, which maintains the unimpeded flow of commerce over the highways I serviced. In fact, most of the accidents I cleared involved delays, if not outright closure, of the traffic on the highway at that time, until the scene could be cleared."[5] Id. The question before the Court is whether the work of plaintiff as a wrecker driver constituted an essential and indispensable part of interstate commerce.

Neither the United States Supreme Court nor the Tenth Circuit Court of Appeals has spoken directly on this point. However, in Overstreet v. North Shore Corporation, 318 U.S. 125 (1943), the Supreme Court considered whether employees engaged in the operation, maintenance, and repair of a toll road and drawbridge were engaged in commerce for purposes of the FLSA. The Court concluded that, under the applicable practical test, "[v]ehicular roads and bridges are as indispensable to the interstate movement of persons and goods as railroad tracks and bridges are to interstate transportation by rail. If they are used by persons and goods passing between the various States, they are instrumentalities of interstate commerce." Id. at 129-30. Therefore, "[t]hose persons who are engaged in maintaining and repairing such facilities should be considered as engaged in commerce . . . because without their services these instrumentalities would not be open to the passage of goods and persons across state lines. . . ." Id. at 130. Moreover, according to an interpretive bulletin issued by the Administrator of the Wage and Hour Division, Employment Standards Administration, United States Department of Labor, a "large category of employees

---

[5] In response to an interrogatory, plaintiff gave two justifications for his contention that he was engaged in commerce for purposes of the FLSA: 1) that, as an employee of Spears, he was involved in the "purchase of diesel fuel, oil, and parts for trucks"; and 2) that "in removing wrecked, non-working vehicles from the highways, he assisted in maintaining the unimpeded flow of commerce over the highways." Dkt. # 17, at 20. The parties' briefs, and the Court's opinion, focus on the latter. The Court does not reach plaintiff's claim, if any, that purchase of out-of-state goods constitutes engagement in commerce.

covered as 'engaged in commerce' is comprised of employees performing the work involved in the maintenance, repair, or improvement of existing instrumentalities of commerce," including highways and city streets and "similar fixed or movable facilities on which the flow of interstate and foreign commerce depends." 29 C.F.R. § 776.11(a). "It is well settled that the work of employees involved in the maintenance, repair, or improvement of such existing instrumentalities of commerce is so closely related to interstate or foreign commerce as to be in practice and in legal contemplation a part of it." Id. at § 776.11(b). However, "work which is less immediately related to the functioning of instrumentalities of commerce . . . may be too remote from interstate or foreign commerce" to establish that the employee is engaged in commerce. Id. at § 776.11(c).

This well-established law regarding the relationship of road maintenance to interstate commerce has been adopted to support a finding that employees of wrecking and towing businesses were engaged in commerce for purposes of the FLSA when removing vehicles from instrumentalities of interstate commerce. See Gray v. Swanney-McDonald, Inc., 436 F.2d 652 (9th Cir. 1971); Crook v. Bryant, 265 F.2d 541 (4th Cir. 1959); Brennan v. Parnham, 366 F. Supp. 1014, 1026 (W.D. Pa. 1974)(stating as a conclusion of law that "[t]he majority of defendant's employees were required to drive tow trucks, to clear and remove wrecks and disabled vehicles from the interstate highway and, accordingly, engaged in commerce within the meaning of the [FLSA] because their regular towing activities cleared the channels of interstate commerce"); but see Jacoby v. Schimka Auto Wreckers, Inc., No. 10 C 1452, 2010 WL 3171515 (N.D. Ill. Aug. 11, 2010).

In Gray, the Ninth Circuit considered whether drivers who, as employees of a towing company, serviced "a number of Interstate and U.S. Highways making up the freeway system of Los Angeles," and, who, on rare occasions, serviced calls "made out of this area" or "out of state," were

engaged in commerce for purposes of the FLSA. 436 F.2d at 653. The defendant argued that, because its employees spent so little time doing work that affected interstate commerce, that aspect of their duties was de minimis and did not result in FLSA coverage. Id. The Gray court disagreed, finding that "[t]he servicing of traffic moving on interstate highways is a significant part of interstate commerce," and that "provision of towing and road services for the national highway system is essential to the free flow of traffic on that system." Id. It therefore concluded that the drivers were engaged in commerce for FLSA purposes, regardless of the amount of time spent on work of an interstate nature.

In Crook, the Fourth Circuit considered whether an employee of a wrecker service, who served as night watchman and janitor and who answered all telephone calls relating to the wrecker service, was an employee engaged in commerce under the FLSA. The wrecker service "furnished 24-hour wrecker and towing service . . . on nineteen miles of a turnpike running from Beckley[, West Virginia] to Flat Top, West Virginia." 265 F.2d at 542. The court found that the turnpike was a connecting link of the system of interstate highways, and that it "serve[d] as an instrumentality of interstate commerce although it [was located] solely in a single state." Id. at 543. Moreover, the court found that "the services of the employee, insofar as they help to maintain the road free from obstruction, facilitated the flow of commerce from state to state." Id. On those grounds, the Crook court found it "obvious that the services rendered by [plaintiff] in connection with the wrecking business of his employers[] helped to keep the interstate flow of traffic free and unobstructed and, hence, were rendered 'in commerce' within the meaning of the [FLSA]." Id.

Defendants rely on Jacoby for their argument that plaintiff was not engaged in commerce under the FLSA. Dkt. # 17, at 6. In Jacoby, the plaintiff, a tow truck driver, sought payment for

9

overtime under the FLSA. His employer claimed that the plaintiff's claims were invalid, in part because the plaintiff had not been engaged in interstate commerce. 2010 WL 3171515, at * 1. The court noted that the plaintiff's "only duty was towing vehicles, and he did not tow any vehicles across state lines, nor did he engage in any communication across state lines." Id. at * 3. It then considered the plaintiff's argument that "his duties as a tow truck driver required that he handle tools, such as chains, jumper cables and wrenches, that likely moved in interstate commerce before being used." Id. On that ground, the court concluded that the plaintiff had failed to show he was an employee covered by the overtime provisions of the FLSA. However, the plaintiff did not argue that his towing duties themselves constituted engagement in commerce, and the court did not consider that separate ground for eligibility under the FLSA. Jacoby is not binding upon the Court and, because the court reached its decision on a ground other than the one at issue, it is not persuasive.

Defendants attempt to distinguish the holdings of Gray, Crook, and Engel on the ground that they involved employees "engaged in partly interstate and partly intrastate activity." Dkt. # 25, at 5-6. They argue that because plaintiff conceded his activities were conducted solely in Oklahoma, those cases are distinguishable. That argument mischaracterizes the holdings of those cases. For instance, defendants focus on the fact that while the wrecker drivers in Gray serviced mostly intrastate roads, on rare occasions, they made calls out of state. Dkt. # 25, at 6. However, three years after it was decided, the Ninth Circuit described Gray as holding that "tow truck drivers doing a portion of their work on Interstate or U.S. Highways were engaged in interstate commerce, and therefore were within the coverage of the Act," and noted that it "remain[ed] convinced of the soundness of that decision." Brennan v. Keyser, 507 F.2d 472, 474-75 (9th Cir. 1974). The

Brennan court read Gray to be based on the interstate character of the roads upon which the towing company was operating, not whether the plaintiff's activities occurred inside or outside of the state.[6]

Regarding Crook, defendants cite Rodgers v. Wright's Provisions, Inc., 310 F. Supp. 136 (D.S.C. 1969), for the proposition that "[i]n Crook, the employee was engaged in partly interstate and partly intrastate activity." Dkt. # 25, at 6. However, Rodgers cites Crook in support of the statement that "[i]t is established that where an employee is engaged partly in interstate, and partly in intrastate activity, he is covered by the [FLSA] as to all his activities." 310 F. Supp. at 140. The court did not comment on the nature of the activities in Crook. And while the Crook court did determine that part of the plaintiff's activities constituted interstate activity, that determination was not based on work by the plaintiff in another state. As noted, the business by which plaintiff was employed in Crook furnished services "on nineteen miles of a turnpike running from Beckley[, West Virginia] to Flat Top, West Virginia." 265 F.2d at 542. Although those services were rendered "to West Virginia cars and also to cars from other states," and the turnpike was "used by vehicles traveling interstate," id. at 542-43, the Crook opinion makes no mention of other interstate activity. Instead, it found that the turnpike "serve[d] as an instrumentality of interstate commerce <u>although it [was located] solely in a single state</u>." Id. at 543 (emphasis added).

Finally, in Engel, which focused on an employee's operation of machinery that generated electricity, the court explicitly noted that the electricity generated "was never transmitted across

---

[6] The Brennan court went on to hold that even state highways could be found to be "so interconnected with the area's interstate highways as to be an instrumentality of interstate commerce." 507 F.2d at 475. In so holding, it relied on "the trial judge's knowledge of local conditions" in finding interconnectivity. Id.

11

state lines for sale or use." 145 F.2d at 638. However, the electricity was used by in-state companies in the operation of their businesses, which were engaged in intrastate and interstate commerce. Therefore, "the work and services performed by the employee in the generation of electricity became so related to the actual movement of commerce as to be considered an essential and indispensable part thereof." Id. at 640. Defendants' focus on the Engel court's language regarding "generation of electricity for use in the movement of interstate commerce" ignores the fact that the employee's activities were wholly intrastate, and that it was the impacts of those intrastate activities on interstate commerce that guided the court's decision.

The Court agrees with the conclusions in Gray and Crook that towing services performed on instrumentalities of interstate commerce are essential and indispensable to the interstate movement of people and goods. As the Supreme Court acknowledged in Overstreet, those engaged in the maintenance and repair of roads used in interstate commerce are engaged in commerce because "without their services these instrumentalities would not be open to the passage of goods and persons across state lines." 318 U.S. at 130. The same is true of those who clear wreckage from instrumentalities of interstate commerce. Here, plaintiff has alleged that he cleared portions of interstate highways located in Oklahoma. Dkt. # 19, at 14. Those portions of interstate highways are used in the transit of people and goods across state lines. Plaintiff also attests that until he performed those services, the highways were often subject to delay or closure. Dkt. # 19, at 14. Taking plaintiff's testimony in the light most favorable to him, a genuine issue of material fact exists as to whether plaintiff's work involved clearing roads for the flow of interstate commerce. If so, he would have been essential and indispensable to the interstate movement of goods, and, therefore,

he would have been engaged in commerce for purposes of the FLSA.[7] Defendants have not argued that any of the exceptions to the overtime provisions in the FLSA are applicable. Therefore, defendants' motion for summary judgment on plaintiff's FLSA claim is denied based on the factual issue of the work he performed. If plaintiff shows his work affected the flow of interstate commerce, he is entitled to FLSA coverage.

**IV.**

Plaintiff also claims that defendants violated Oklahoma law by deducting money from his paycheck to recover repair costs "without obtaining a bona fide payroll deduction agreement, in writing, prior to deducting any money for said breakage." Dkt. # 2, at 4. Plaintiff alleges that this was in direct violation of OKLA. STAT. tit. 40, §§ 165.1 et seq. Both parties agree that OKLA. STAT. tit. 40, § 165.2 authorizes deductions from an employee's pay. Dkt. ## 17, at 8; 19, at 16. That section states, in relevant part, that "[w]ith each payment of wages . . . the employer shall issue a brief statement of any and all deductions therefrom." However, plaintiff argues that provisions of

---

[7] Such a finding is not disturbed by plaintiff's acknowledgment that some of his work was not conducted on instrumentalities of interstate commerce. "There is strong authority for the proposition that if an employee's duties are partly intrastate and partly interstate, his entire compensation must conform to the provisions of the statute." Crook, 265 F.2d at 544. As noted in Engel, "it is not the volume or percentage of an employee's contribution to the movement of commerce which is the test of whether he is 'engaged in commerce' within the meaning of the [FLSA]. If the services he performs are essential to the movement of commerce and not merely sporadic and isolated, he is engaged in commerce within the meaning of the [FLSA]." 145 F.2d at 640; see also Gray, 436 F.2d at 653 ("[t]he fact that [towing and road services for interstate highways] are a small part of [defendants'] business renders them no less important to interstate commerce . . . . we cannot ignore the cumulative effect that the many small companies in [defendants'] position have upon commerce between the states. . . . The fact that any given, or every given, company's contacts with interstate commerce are extremely small is irrelevant.").

the Oklahoma Administrative Code promulgated by the Oklahoma Department of Labor modify an employer's ability to withhold deductions from employee's pay.

> Specifically, he relies on the following subsections of OKLA. ADMIN. CODE § 380:30-1-7:
>
> The term 'deductions,' as used in 40 O.S. § 165 et. seq., is defined as any and all sum(s) of money withheld by the employer from an employee's wages. OKLA. ADMIN. CODE § 380:30-1-7(b).
>
> No employer shall deduct any amount from an employee's wages, unless legislation or a court order mandates such,[8] or unless such deduction is made pursuant to the provisions of this section. OKLA. ADMIN. CODE § 380:30-1-7(c).
>
> It is permissible for an employer and employee to voluntarily enter into a payroll deduction agreement, including deductions for . . .breakage or loss of merchandise . . . caused by the employee where the employee was the sole party responsible for the . . . items damaged . . . at the time the damage or loss occurred. OKLA. ADMIN. CODE § 380:30-1-7(d).
>
> Any payroll deduction agreement made pursuant to subsection (d) must be in writing, and signed by the employee before any deduction authorized by such agreement is taken. OKLA. ADMIN. CODE § 380:30-1-7(e).

Defendants argue in their motion for summary judgment that the Oklahoma Administrative Code provisions are inapplicable to plaintiff's claim, Dkt. # 17, at 8-9, but change tack in the reply to the motion to claim that there is no need for the Court to reach the Oklahoma Administrative Code provisions because § 165.2 is unambiguous and, based on the "undisputed, material facts of this case," plaintiff was responsible and agreed to pay for the damage to the vehicle. Dkt. # 25, at 7-9.

Oklahoma courts have not expressly addressed the relationship between OKLA. STAT. tit. 40, § 165.2 and the requirements of OKLA. ADMIN. CODE § 380:30-1-1. Section § 165.2 refers generally to deductions that may be made from an employee's paycheck, and notes that such deductions must

---

[8] There is no argument that deductions from plaintiff's paycheck occurred pursuant to legislative or judicial mandate.

be accompanied by an itemized statement. However, according to an Opinion from the Attorney General of Oklahoma, "[t]he itemized statements of any and all deductions from an employee's wages referred to in [OKLA. STAT. tit. 40, § 165.2] only means those deductions that the employer is required to deduct by law, such as income tax, Social Security, and those wages which may be ordered withheld by order of a court." Okla. Att'y Gen. Op. 67-912. The statute says nothing about other, non-mandatory deductions from an employee's paycheck.

"Pursuant to the Administrative Procedures Act, [OKLA. STAT. tit. 75, §§ 250-353], the Legislature may delegate rulemaking authority to agencies, boards, and commissions to facilitate the administration of legislative policy." Estes v. ConocoPhillips Co., 184 P.3d 518, 523 (Okla. 2008). "Administrative rules are valid expressions of lawmaking powers having the force and effect of law." Id.; see also OKLA. STAT. tit 75, § 308.2(C)(agency rules promulgated pursuant to the Administrative Procedures Act "shall be valid and binding on persons they affect, and shall have the force of law," and "shall be prima facie evidence of the proper interpretation of the matter to which they refer"). The Protection of Labor Act, OKLA. STAT. tit. 40, § 165.1 et seq., delegates power to the Commissioner of Labor to "enforce and administer the provisions of th[e] act." OKLA. STAT. tit. 40, § 165.7. "The purpose of the rules in Chapter 30 [of the Oklahoma Administrative Code] is to establish the definitions and procedures for enforcement by the Department [of Labor] of the provisions of Title 40, Oklahoma Statutes, Sections 165.1 through 165.11." OKLA. ADMIN. CODE § 380:30-1-1. "Statutory construction by agencies charged with the law's enforcement is given persuasive effect." Estes, 184 P.3d at 524. "[I]f the Legislature disagrees with an agency interpretation," it may take actions to frustrate the passage of a rule. Id. Consequently, silence from

the Legislature is "evidence of the lawmakers' consent and adoption of the administrative construction." Id.

OKLA. ADMIN. CODE § 380:30-1-7(e) was amended in 2009 to "clarify the requirements for a valid payroll deduction agreement," and to rectify the situation that existed prior to amendment, wherein "[m]any employers [we]re not aware that the employer's signature is required and many payroll deduction agreements [were] invalidated" because the rule prior to amendment did "not state when the payroll deduction agreement must be signed," even though "the Oklahoma Department of Labor "ha[d] been requiring the agreement to be signed before the deduction [wa]s made." 2009 Okla. Reg. Text 175574. Therefore, the amendment was proposed to "eliminate the requirement that the employer sign the agreement and specify that the agreement must be signed before the payroll deduction is made. The main purpose of the payroll deduction agreement [wa]s to protect the employee by ensuring that the employee is aware of the deduction before it is taken." Id. On March 31, 2009, the proposed amendments to OKLA. ADMIN. CODE § 380:30-1-7(e) were submitted to the Oklahoma State Senate and House of Representatives. Id. The Legislature failed to disapprove the rules, resulting in approval on May 22, 2009. Id. Thus, the Legislature had a recent opportunity to disapprove of the codification of the Department of Labor's long-standing practice of requiring a signature prior to deductions from an employee's paycheck. Its silence in the face of that amendment is evidence of "consent and adoption of the administrative construction" of OKLA. STAT. tit. 40, § 165.2. Estes, 184 P.3d at 524. The Court finds that the provisions of the Oklahoma Administrative Code related to protection of labor must be read in conjunction with the Protection of Labor Act.

This conclusion is supported by a leading treatise on Oklahoma law, which notes that "[t]here is much debate as to the exact meaning of [the provisions of § 165.2] and, frankly, little help by the Courts. However, the Oklahoma Department of Labor has issued regulations which provide guidance on handling situations concerning the payment of wages to employees including . . . the conditions under which an employer can deduct any sum from wages due . . . . For example, deductions not required by law or requested by the employee[9] cannot be made without a written agreement signed by the employee prior to the deduction and even then the deductions must be for one of the enumerated reasons found in the regulations." 3C Vernon's Okla. Forms 2d, Bus. Org. § 14.23. And what appears to be the only other court to consider this issue found that § 380:30-1-7 is "one of the regulations enacted to implement the provisions of 40 Okla. Stat. §§ 165.1-165.11," that it prohibits employers from making deductions from employees' wages except as set forth in the Code, and that genuine issues of material fact as to compliance with that regulation preclude entry of summary judgment on a claim for improper deductions. Townsend v. BG-Meridian, Inc., No. CIV-04-1162-F, 2005 WL 2978899, at * 8 (W.D. Okla. Nov. 7, 2005). There is a genuine issue of material fact as to whether defendants complied with § 380:30-1-7(e), and summary judgment is therefore inappropriate.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment and Brief in Support (Dkt. # 17) is **denied**.

**DATED** this 19th day of May, 2011.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[9] Section 380:30-1-7(e) does not contain an explicit exception for deductions requested by employees, and the parties have not briefed the applicability of this exception, if one exists. However, to the extent that a showing that plaintiff requested the deduction would defeat the need for a signed writing, there exists a genuine issue of material fact as to whether he requested the deductions. Dkt. ## 19, at 8-9; 19-4, at 11.

17